**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF A.R., A MINOR CHILD, DECEASED, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-0533 |
| | § | |
| TERRY B. GRIER, SUPERINTENDENT OF THE HOUSTON INDEPENDENT SCHOOL DISTRICT, IN HIS OFFICIAL CAPACITY, *et al.*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

A.R., a child with special needs, drowned in a public-school swimming pool during a summer-enrichment program. Her mother and estate sued the Houston Independent School District (HISD) and several of its employees. The plaintiffs asserted violations of A.R.'s constitutionally protected rights and of various federal laws prohibiting discrimination against individuals with disabilities. Earlier in this case, two of the defendants, a teacher and the principal of the school where the drowning occurred, moved for summary judgment based on qualified immunity. This court granted their motion and dismissed the claims against them. (Docket Entries No. 68, 71). HISD, the remaining defendant,[1] has now moved for summary judgment. (Docket Entries No. 81,

---

[1] The claims against the City of Houston were dismissed on May 14, 2010. (Docket Entry No. 20).

98).  Based on the record; the motion, response, and reply; and the relevant law, this court grants

HISD's motions for summary judgment.[2]  Because this ruling dismisses the claims against the

remaining defendant, final judgment is entered by separate order.

The reasons for the rulings are explained in detail below.

## I.    Background[3]

In the 2007–2008 academic year, A.R. was a student at T.H. Rogers Elementary School,

which has programs for students with impairments or disabilities and for students who are

academically gifted and talented.  A.R. had severe hearing loss and participated in the Regional Day

School Program for the Deaf (RDSPD) at T.H. Rogers.  A.R. also had seizures, for which she took

medication.  Although she had had seizures at school during the regular academic year and the

---

[2] There is also pending a motion to strike the plaintiffs' expert-witness list.  (Docket Entry No. 95).  That motion is denied as moot.

[3] This court already discussed the facts of this suit in its summary-judgment opinion on qualified immunity for the individual defendants.  (Docket Entry No. 68).  In addition to the evidence produced for the last summary-judgment ruling, the summary-judgment evidence attached to the present motions includes, for the defendants' motions: the affidavits of C. Evans, M. Njoku, Q. Jarrett, F. Waters, D. Muzyka, S. Hutchinson, A. Rangel, M. Baker, Y. Sugiura-Baldwin, V. Masaba, A. Allen, D. Owens, T. Grier, G. Meyers, and L. Carter.  (Docket Entry No. 98, Exs. 1–10, 13–17).  HISD also included the plaintiffs' responses to interrogatories and several documents produced to HISD in response to requests for production.  (*Id.*, Exs. 11–12, 18).  Evidence produced by the plaintiffs includes: A.R.'s school records, (Ex. A); the HISD Office of Inspector General's report, (Ex. B); A.R.'s autopsy report, (Ex. C); The Texas Child Protective Services Investigation Report, (Ex. D); various documents about HISD swimming pools, (Ex. E); a portion of the Houston Municipal Code, (Ex. F); Crystal Evans's deposition, (Ex. G); several news stories, (Exs. H–I); a description of the summer enrichment program, (Ex. J); a medical note for A.R., (Ex. K); various items related to the death of C.A., another HISD student who drowned in a school pool, (Ex. L); the declarations of Tomasa Rodriguez and Mayra Santos, (Exs. M–N); A.R.'s medical records, (Ex. O); expert reports from Anita Marchitelli, Peter Antevy, Gerald Dworkin, James Hollis, and Scott Poland, (Exs. P–T); and various decisions of the Department of Health and Human Services's Office of Civil Rights, (Ex. U).  In its response, HISD attached an additional affidavit from Muzyka. (Docket Entry No. 112, Ex. B).  HISD also raises numerous objections to the plaintiffs' summary-judgment evidence.  (Docket Entry No. 112, Ex. A).  Because it does not change the outcome to consider the plaintiffs' evidence, HISD's objections are overruled as moot.

school nurse was aware of that fact, whether her summer-enrichment program teachers were also aware is vigorously disputed.

A.R. completed third grade in spring of 2008. That summer, her mother enrolled her in the summer-enrichment program conducted by the RDSPD at T.H. Rogers for hearing-impaired students. The program took place from early June to early July. A.R. had attended the program in previous summers. The program included regular swimming in the pool at T.H. Rogers. A.R. knew how to swim and swam regularly during each of the summers she participated in the enrichment program. During those previous summers and in the summer of 2008, A.R.'s mother had given written permission for her daughter to swim during the program. (Docket Entry No. 45, Ex. 4, Waters Aff.; Ex. 6-A, Parent Permission Form – Swimming).

During the 2006-2007 and 2007-2008 school years, A.R. participated in one of Evans's physical education classes. (Docket Entry No. 98, Ex. 1, Evans Aff.; Ex. 3, Jarrett Aff.).[4] As one of A.R.'s teachers, Evans received the page from A.R.'s individual education plan (IEP) with the schedule of instructional services. The IEP had been developed by A.R.'s Admission, Review and Dismissal (ARD) Committee to meet the Individuals with Disabilities Education Act (IDEA). (*Id.*) The only modifications or accommodations shown on the IEP schedule Evans received were sound amplification and preferential seating in class. (*Id.*) Evans never participated in discussions at an ARD Committee meeting for A.R. except perhaps to give a statement. Evans was never present at an ARD Committee meeting for A.R. when the Committee discussed her seizures.

---

[4] HISD's motion to dismiss and the exhibits attached to it were originally docketed as Docket Entry No. 94. Due to a technical problem while posting its motion, HISD redocketed its motion as Docket Entry No. 98. This court will refer to the exhibits originally attached to Docket Entry No. 94 as if they were also attached to Docket Entry No. 98.

3

There is no record evidence that A.R.'s parents or her medical-care providers limited her swimming or told HISD to do so.  There is no evidence that the T.H. Rogers teachers and staff involved with A.R. during the academic year communicated A.R.'s seizure history to her summer-enrichment program teacher or other staff.  There is some evidence that some of the staff had seen A.R. have what looked like seizures during the summer-enrichment program.  Although the summer-enrichment class roster has a space set aside to indicate special requirements or restrictions for each student, none was noted for A.R.

On June 26, 2008, A.R. drowned in the T.H. Rogers pool.  HISD's internal investigation showed that she was sitting on the ledge of the pool, apparently had a seizure, and fell in the pool. Two HISD employees, Evans and Waters, were supervising.  Evans was a physical education teacher at T.H. Rogers and the coach for the middle school girls' swim team.  Waters was the coach for the middle school boys' swim team.  Both Evans and Waters were certified in water safety, CPR, and use of an AED.

Many of the details of A.R.'s drowning are disputed.  The investigation reports and Evans's testimony show varying numbers of adults and students present.  Evans described approximately 8 adults in the pool area, herself included.  (Docket Entry No. 107, Ex. G, Evans Dep., at 125).  An "alert message" sent by the school at 6:32 p.m. on June 26 stated that 28 children and 16 adults were in the pool area.  (Docket Entry No. 107, Ex. D, at 123, Message from T.H. Rogers School).  There are also disputes about how much time A.R. spent under water before Evans and others pulled her to the surface.  (*See generally* Docket Entry No. 59, Ex. B, HISD Investigative Inquiry Report; Ex. D, Child Protective Services Report).  There are disputes about whether Evans or other teachers and staff involved with A.R. in the summer enrichment program knew of her seizures.  There are

4

disputes about the extent to which Evans watched A.R. and how long it took her to pull her from the water.  But it is undisputed that there is no evidence that any individual affirmatively harmed A.R., as opposed to failing to prevent her from falling into the pool and failing to rescue her fast enough to prevent her from drowning.

The key disputes areas concern the timeline of A.R.'s drowning and failed rescue.  (*See generally* Docket Entry No. 107, Ex. D).  A Child Protective Services investigator interviewed several witnesses through a sign-language interpreter.  These witnesses appear to have been other students who were present and saw some of the events in question.  One witness was swimming with goggles.  He had noticed A.R. playing around the pool area, then saw her at the bottom of the pool.  This witness went to Evans to report what he saw, but it was difficult to get Evans's attention because she was talking to another teacher.  Another witness reported seeing A.R. running around the pool, falling in, and remaining in the water for about 2 minutes.  This witness also used goggles to see A.R. at the bottom of the pool.  Another witness reported that A.R. was sitting at the edge of the pool when she fell in, and it looked like she was sleepy.  This witness was also able to see A.R. under water using his goggles, and reported that she was under water a long time.  The witness approached Evans and had to interrupt her conversation with other adults to get her attention. Another witness reported seeing A.R. appear to fall asleep by the edge of the pool and fall in.  He recalled that she must have been in the water a long time because everyone was talking and playing. Another witness reported that A.R. was walking just before she fell in the pool and it looked like she was not paying attention.  She was shaking and her eyes were rolling back when she fell.  This witness saw A.R. hit her head when she fell into the pool and reported that her nose was bleeding. This witness estimated that A.R. was in the water 5 minutes.

5

These accounts are significantly inconsistent with Evans's description.  Evans saw A.R. sitting on the edge of the pool.  Evans turned away briefly.  When she looked back, she saw A.R. still sitting on the pool edge, swaying slightly back and forth.  Evans then saw A.R. fall face forward into the pool.  Evans claimed that she was less than 5 feet away and immediately jumped in.  Evans thought that A.R. was not under water for more than a minute.  She called out for Waters to help as she was attempting to pull A.R. from the water.  Although other adults were present in general pool area, only Evans testified that she saw A.R. fall in the water.

The parties also dispute what, if any, accommodations were made at the pool for use by individuals with disabilities.  HISD reports show that it provided various safety measures and "multiple accommodations" for pool use.  These included requiring written permission from parents for children to swim; monitoring  swimming skills to determine additional needs such as life vests; providing life vests based on the nature of the disabilities;[5] providing an additional person to assist in the water; requiring swim participants to be at least 6 years old; adhering to basic safety rules on running, jumping, diving, and getting in and out of the pool; providing two individuals certified in CPR, AED use, and water-safety, whose only responsibility was monitoring students in the water; requiring teachers and teachers' assistants to be present and get in the water with the children; keeping the two entryways to the pool locked and prohibiting entrance without an individual trained in water safety present; providing a shallow pool with a wheelchair ramp; installing an emergency phone (though not one equipped for use by hearing-impaired persons)[6] in the pool area; providing

[5]  It is undisputed that A.R. was not wearing a life vest.  It is not clear whether HISD did not provide her one because it felt her disabilities did not warrant one or for some other reason.

[6]  A TTY, also known as Text Telephone Device or Telecommunication Device for the Deaf (TDD), is a special device, required at both ends of the conversation, that enables people who are

a teacher with a walkie-talkie to contact the school office directly; placing a defibrillator in the pool area; making sure all students left the locker room at same time; requiring that teachers keep their eyes on the students; and making sure that teachers and teachers' aides competent or fluent in sign language were with hearing-impaired children in the pool area.  (Docket Entry No. 98, at 26).

The parties dispute whether a lifeguard was present at the pool.  The crux of the dispute appears to center not on whether Waters and Evans had the necessary qualifications to be lifeguards, but that no adult was lifeguarding to the exclusion of coaching, teaching, or other tasks when A.R. drowned.  The parties also dispute whether the pool area had a fire-alarm system equipped with both sound and visual alerts, although the only summary-judgment evidence on this point is Muzyka's statement that the pool did have such a system.

A.R.'s estate and her mother sued, among others, Evans and Muzyka, who was the principal at T.H. Rogers.  (Docket Entry No. 28-2).  The complaint asserted a Fourteenth Amendment violation under 42 U.S.C. § 1983 and violations of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Texas law.  The plaintiffs withdrew their state-law claims.  (Docket Entry No. 43).  After discovery targeted to qualified-immunity issues, Evans and Muzyka moved for summary judgment that they were not liable for damages in their individual capacities.  This court granted that motion and dismissed the individual defendants.  (Docket Entries No. 68, 71).  The remaining claims were the § 1983 and the ADA and Rehabilitation Act claims against HISD.

---

deaf, hard of hearing, or speech-impaired to use a telephone to communicate.  TTY works by allowing people to type messages back and forth to one another instead of talking and listening.

On April 13, 2012, HISD filed a motion for partial summary judgment on the § 1983 claim. (Docket Entry No. 81).   On April 26, 2012, this court held a discovery hearing on the remaining ADA and Rehabilitation Act claims.   The court and parties discussed additional discovery tailored to the ADA and Rehabilitation Act claims and set July 31, 2012 as the deadline to complete that discovery.   (Docket Entry No. 83).   The plaintiffs conceded that their § 1983 claims against HISD were largely foreclosed by the Fifth Circuit's recent en banc decision in *Doe ex rel. Magee v. Covington County School District*, 675 F.3d 849 (5th Cir. 2012).   The plaintiffs did not respond to HISD's motion for partial summary judgment on the § 1983 claim.   HISD filed its motion for partial summary judgment on the ADA and Rehabilitation Act claims on September 7, 2012.   (Docket Entry No. 98).   The plaintiffs responded, (Docket Entry No. 107), and HISD replied, (Docket Entry No. 112).

HISD argues that it cannot be held liable for a constitutional violation because no state actor injured A.R. and she had no special relationship with her school that would have required HISD to protect her from drowning.   (Docket Entry No. 81).   HISD also argues that the plaintiffs' discrimination claims fail as a matter of law.   The primary arguments HISD raises are the absence of any evidence that it: denied A.R. a benefit by failing to accommodate her disabilities; failed to provide certain modifications for members of the general public with disabilities; failed to implement A.R.'s IEP; or intentionally discriminated against A.R. because of her disabilities. (Docket Entry No. 98). The plaintiffs respond that summary judgment is precluded by evidence that HISD failed to provide a required modification and to accommodate A.R.'s disabilities by not providing a visual-alert alarm system and not having a TTY device at the pool, and by evidence that HISD failed to implement A.R.'s IEP by not meeting her medical needs when she swam.   The

plaintiffs argue that circumstantial evidence on all these arguments could support an inference that HISD intentionally discriminated against A.R. (Docket Entry No. 107).

The parties' arguments and responses are discussed below.

## II.     The Summary-Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant

must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## II.     The § 1983 Claim

A court faced with a claim that a school district is liable for a student's injury or death examines whether the harm to that student was caused by a constitutional violation and, if so, whether the school district is responsible for that violation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). The Fifth Circuit has "stated time and again that without an underlying constitutional violation, an essential element of [school district] liability is missing." *Covington*, 675 F.3d at 866–67 (alteration omitted) (quotation omitted). Physical injury to, or death of, a student violates due process in two limited circumstances: (1) the plaintiff's physical injury was inflicted by a state actor — such as a school employee — or (2) the plaintiff's injury was inflicted by a private actor, but the plaintiff had a "special relationship" with the State that gave rise to a duty to protect the plaintiff from the private actor. *Id.* at 855–56. As a matter of law, "[n]o . . . special relationship exists between a public school and its students." *Id.* at 870 (Jolly, J., specially concurring) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)).

In *Covington*, the Fifth Circuit considered whether the plaintiff adequately alleged a violation of a constitutional right. School personnel allowed a nine-year old girl to "check out" with a man not authorized to take the child out of school. The man molested the child on six separate occasions.

10

*Id.* at 853 (majority opinion).  As the Fifth Circuit explained, the constitutional claim was based not on the molestation, "but rather upon the school's allegedly deficient check-out policy, which allowed the molestation to occur" because the policy did not require school officials to verify the identity of individuals before releasing children to their custody.  *Id.* at 855.  Finding that the school district defendants had no constitutional duty to protect the plaintiff from a private actor, the Fifth Circuit determined that the plaintiff failed to allege a violation of any constitutional right.  *Id.* at 863. The Fifth Circuit clarified that a school district's duty to protect a student depends on the existence of a special relationship, which as a matter of law did not exist between a school district and a student.

The plaintiffs do not allege that a state actor intentionally injured A.R.  The plaintiffs do claim that HISD's failure to have adequate adult supervision while students were in the pool area, to have a dedicated lifeguard present, and to have certain emergency-alert systems in the pool area, all contributed to cause A.R. to drown.  Assuming that the record would support an inference that taken together, at least some of these failures contributed to cause A.R.'s death, that does not preclude summary judgment on the constitutional claim against HISD.  The record shows that, as a matter of law, HISD had no special relationship with A.R. that would give rise to a federal constitutional duty — as opposed to a state-negligence-law duty — to protect her from harm.  *See id.* at 855–57; *see also Estate of Brown v. Cypress Fairbanks Indep. Sch. Dist.*, 863 F. Supp. 2d 632, 636 (S.D. Tex. 2012) ("*Covington* makes clear that any duty to protect must be moored to a special relationship.").  Absent that relationship and duty, the evidence outlined above, including evidence showing a failure to comply with HISD's own policies governing school pool use, could not, as a matter of law, have resulted in a deprivation of A.R.'s due process rights.  *See Covington*, 675 F.3d

11

at 855–57.

Plaintiffs in cases presenting similar facts have sought to hold school districts liable under

a "state-created danger" theory. This circuit has rejected these arguments. Under this circuit's law,

> [T]he state-created danger theory of liability is derived from language
> in the Supreme Court's decision in *DeShaney v. Winnebago County
> Department of Social Services*, 489 U.S. 189 (1989). . . :
>
>> While the State may have been aware of the dangers
>> that [the victim] faced in the free world, it played no
>> part in their creation, nor did it do anything to render
>> him any more vulnerable to them. . . . [The State]
>> placed him in no worse position than that in which he
>> would have been had it not acted at all.

*Dixon v. Alcorn Cnty. Sch. Dist.*, 2012 WL 6019053, at *2 (5th Cir. Dec. 4, 2012) (per curiam)

(alterations in original). The Fifth Circuit "has consistently refused to adopt the state-created danger

theory." *Id.* (citing *Covington*, 675 F.3d at 865; *Kovacic v. Villareal*, 625 F.3d 209, 214 (5th Cir.

2010)). The Fifth Circuit has stated the elements that such a cause of action would require if it was

recognized. A plaintiff would have to show "(1) that the environment created by the state actor is

dangerous, (2) the state actor must know it is dangerous (deliberate indifference), and (3) the state

actor must have used its authority to create an opportunity that would not otherwise have existed for

the third party's crime to occur." *Id.* (citing *Covington*, 675 F.3d at 865). "Critically, [the Fifth

Circuit] has explained that the 'state-created danger theory is inapposite without a known victim.'"

*Covington*, 675 F.3d at 865 (quoting *Rios v. City of Del Rio*, 444 F.3d 417, 424 (5th Cir. 2006)).

During oral argument on HISD's motion for summary judgment, the plaintiffs conceded that

the facts of this case did not justify applying the state-created danger theory for the first time within

this circuit. (Docket Entry No. 84, Tr. at 22). As plaintiffs' counsel observed, "I'm not sure I would

even make the state-created danger claim in [this case].  [A.R.]'s sitting by the side of the pool, and

there are people there.  They're just not paying attention."  (*Id.* at 21).  When this court asked

plaintiffs' counsel if he had a state-created danger claim, counsel replied, "I do not."  (*Id.* at 22).

As counsel acknowledged, the facts of this case and current Fifth Circuit law do not provide a basis

for applying the state-created danger theory.

Because the plaintiffs cannot show that HISD violated A.R.'s constitutional rights, HISD is

entitled to summary judgment on the plaintiffs' § 1983 claim.

## III.    The ADA and § 504 Claims

Title II of the ADA and § 504 of the Rehabilitation Act both prohibit discrimination against

qualified individuals with disabilities.  Title II of the ADA focuses on disability discrimination in

the provision of public services.  The relevant part of Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the benefits
> of the services, programs, or activities of a public entity, or be
> subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act prohibits disability discrimination by

recipients of federal funding.[7]  Section 504 provides:

> No otherwise qualified individual with a disability in the United
> States . . . shall, solely by reason of her or his disability, be excluded
> from the participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal
> financial assistance . . . .

---

[7]  HISD disputes whether the summary-judgment evidence shows that it receives federal
funding.  To consider the plaintiffs' claims under the assumption that HISD receives federal funding
does not change the outcome.  Because HISD is entitled to summary judgment on other grounds,
this court does not decide whether the summary-judgment evidence shows that HISD receives
federal funding.

29 U.S.C. § 794.  Both Title II of the ADA and § 504 are enforceable through a private right of action.  *See, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) ("It is established that Title II of the ADA and § 504 of the Rehabilitation Act are enforceable through an implied private right of action.").

The elements of a claim under Title II of the ADA are that: (1) the plaintiff is a qualified individual within the meaning of the ADA; (2) she was excluded from participation in or denied the benefits of services, programs, or activities for which a public entity is responsible, or was otherwise subjected to discrimination by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004); *I.A. v. Seguin Indep. Sch. Dist.*, 2012 WL 3028350, at *3 (W.D. Tex., July 24, 2012).  To recover damages, a plaintiff must prove that the discrimination was intentional.  *Delano–Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).  Courts use similar liability standards in interpreting claims under the ADA and § 504.  *See D.A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability standards under § 504 and the ADA, we evaluate D.A.'s claims under the statutes together." (citations omitted)).  It is well established that the ADA and § 504 do not create "general tort liability for educational malpractice."  *D.A.*, 629 F.3d at 454.

The parties dispute the standard for showing intentional discrimination under either the ADA or the Rehabilitation Act.  The defendants contend that to proceed under either claim, the plaintiffs must make a showing that the state actors engaged in "bad faith or gross misjudgment."  (Docket Entry No. 98, at 36–37 (citing *D.A.*, 629 F.3d at 454–55 (citing *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982)))).  In *D.A.*, the Fifth Circuit considered the interplay among the ADA,

the Rehabilitation Act, and the IDEA.  D.A. brought claims under all three statutes.  The district court considered a challenge to a school's alleged failure to act under the IDEA by failing to administer a timely test to D.A. for special education.  The district court granted summary judgment for the school.  The appellate court noted that while the IDEA imposes an affirmative obligation to assure children with disabilities a free appropriate public education, § 504 and the ADA broadly prohibit discrimination in federally assisted programs or activities.  629 F.3d at 453.  In this context, the court reiterated that a § 504 claim requires intentional discrimination against a student on the basis of his disability.  The court held that evidence "creating an inference of professional bad faith or gross misjudgment" is necessary to show "intentional discrimination under § 504 or ADA against a school district predicated on a disagreement over compliance with IDEA."  *Id.* at 455.

In this case, only some of the claims implicate the IEP that was issued for A.R. under the IDEA.[8]  The rest of the claims concern various failures to accommodate A.R.'s disabilities, not necessarily as a special-education student, but as a member of the general public with disabilities.  HISD nevertheless argues that the "bad faith or gross misjudgment" standard applies to all the ADA and § 504 claims because they arise in the education context.

The plaintiffs argue for the following standard:

> [I]f a claim [is] based upon whether or not the educators departed grossly from accepted standards among educational professionals with respect to the agreed upon educational plan, then the §504 or

---

[8]  HISD states that the plaintiffs "have not asserted any claim under the IDEA in the present case," (Docket Entry No. 112, at 4 n.2).  But the plaintiffs clearly believe that HISD can be liable for failing to implement properly A.R.'s IEP.  (*See* Docket Entry No. 107, at 59 ("The School District here wholly disregarded A.R.'s safety by ignoring the accommodations mandated by her IEP designed to allow her to swim and engage in other activities safely.")).  This court construes the plaintiffs' argument not as a claim directly under the IDEA, but as a claim under § 504 based on a failure to implement a plan promulgated because of the IDEA.

> ADA claim must be analyzed under a 'bad faith or gross misjudgment' standard.  Alternatively, if an alleged violation of the ADA (or § 504) is based upon a violation of, or failure to follow an exacting accommodation or modification standard set by law or rule, (discrimination) then the violation is *not* based upon a deviation from professional judgment, because there is no room for such a type of judgment, but rather then the correct standard of review is whether or not such acts or omissions were intentional.

(Docket Entry No. 107, at 47).  The plaintiffs break their claims down into claims that A.R. was denied benefits based on her disabilities because HISD failed to provide certain required modifications for the severely hearing impaired, and failed otherwise to accommodate A.R.'s specific disabilities.[9]  In the first category, the plaintiffs allege that A.R. was denied several accommodations necessary for safety at the pool, including the denial of emergency-alert systems modified for the use of hearing-impaired individuals.  The plaintiffs contend that the standard is whether HISD intentionally failed to provide these accommodation devices.  In the second category, the plaintiffs allege that HISD denied A.R. similar benefits by failing to otherwise accommodate her disabilities.  For this claim, the plaintiffs contend that HISD is liable if it was deliberately indifferent toward A.R.'s disabilities.  The plaintiffs also allege that HISD denied A.R. the benefit of public education by failing to implement and accommodate her IEP.  For this set of claims, the plaintiffs agree that the "bad faith or gross misjudgment" standard applies to the decisions and actions of HISD employees and officials.

The plaintiffs' proposed legal framework for analyzing their claims is somewhat internally inconsistent and not fully supported by case law.  At one point in their summary-judgment response,

---

[9] HISD disputes whether A.R. had a bona fide seizure disorder, apart from her deafness, that qualified as a disability.  But to consider that A.R. was disabled by a seizure disorder does not affect the outcome.  Nor does any party seriously dispute that HISD placed A.R. in an educational environment for students with multiple impairments.

the plaintiffs cite *Delano-Pyle* for the proposition that "there is no *deliberate indifference* standard applicable to public entities for purposes of the ADA or the Rehabilitation Act. . . . [I]n order to receive compensatory damages for violations of either of these Acts, a plaintiff must show intentional discrimination."  (Docket Entry No. 107, at 44–45 (citing 302 F.3d at 575)).  The plaintiffs later cite another case, *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 777 (W.D. Tex. 2008), for the proposition that "the standard of review is something *lower* than the deliberate indifference standard applied in § 1983 cases. . . . '[T]o prevail on a claim under Section 504, a plaintiff must prove that the discrimination was *intentional*; proof of *deliberate indifference is not required*." (Docket Entry No. 107, at 45–46 (citing *Salinas*, 557 F. Supp. 2d at 781–82)).  Later still, the plaintiffs cite *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), for the proposition that a "school district violates § 504 when it demonstrates deliberate indifference to known acts of discrimination, which bars the victim's access to the benefit of education." (Docket Entry No. 107, at 61 (citing *Davis*, 526 U.S. at 633)).  *Davis*, however, addressed whether Title IX and the Rehabilitation Act provided remedies similar to those available for sexual-harassment claims, not whether a deliberate-indifference standard applies to § 504 claims.  The plaintiffs do not discuss the discrepancies in the precedents.

Contrary to the plaintiffs' suggestion, the cases cited do not support applying a deliberate-indifference standard.  Nor do the cases support the plaintiffs' suggestion that proving intentional discrimination in providing benefits to individuals with disabilities is less burdensome than proving deliberate indifference about whether accommodations needed to provide access to benefits are in place.  But is also unclear, as HISD urges, that the *Monahan v. Nebraska* standard of bad faith or gross misjudgment applies to all the plaintiffs' claims.  As one court recently noted, the Fifth Circuit

17

has not squarely addressed whether bad faith or gross misjudgment applies to all disability-discrimination claims arising in the education context, or just to claims based on compliance with the IDEA, such as failures to implement IEPs. *J.D. ex rel. Degelia v. Georgetown Indep. Sch. Dist.*, 2011 WL 2971284, at *7 n.3 (W.D. Tex. July 21, 2011) ("[I]t is not clear that the Circuit has adopted the *Monahan* standard in Section 504 and ADA cases in the educational context. . . . [T]he Circuit has explicitly adopted the *Monahan* standard in § 504 and ADA cases that were 'predicated on a disagreement over compliance with the IDEA.'" (quoting *D.A.*, 629 F.3d at 454–55)).

While clarification of the standard would be helpful, it is not necessary to decide the motions present here. There is no summary-judgment evidence supporting an inference that HISD or its employees intentionally discriminated against A.R. because of her disabilities. The summary-judgment evidence shows neither an intentional failure to accommodate A.R.'s disabilities nor deliberate indifference about whether her disabilities were accommodated. Similarly, the summary-judgment evidence does not show bad faith or gross misjudgment in HISD's efforts to provide A.R. the benefits of the summer-enrichment program.

A.     **The Evidence of Failure to Accommodate A.R.'s Disabilities**

The plaintiffs' ADA and § 504 failure-to-accommodate claims appear to address only accommodations for A.R.'s hearing impairment. The plaintiffs have neither alleged nor argued access to benefits — that is, that A.R.'s rights under the ADA and § 504 were violated — because HISD failed to provide reasonable educational accommodations for a student with epilepsy using a school swimming pool.[10] The plaintiffs' only failure-to-accommodate arguments discuss failures

---

[10]   Although the plaintiffs refer extensively throughout their briefing to A.R.'s seizure disorder, and state that "[t]he failure to accommodate this disability will be addressed separately," (Docket Entry No. 107, at 49, n.23), that disability is not addressed in the failure-to-accommodate

to provide safety accommodations for the educational benefit of hearing-impaired students. For example, the plaintiffs do not argue that the emergency-alert equipment at the pool needed to be modified to suit children who had a history of seizures.

To sustain her claim under either § 504 or the ADA, the plaintiffs must allege that A.R. was denied a public benefit because of her disability. The plaintiffs allege that A.R., along with the rest of the hearing-impaired children in her summer program, were denied an accessible emergency-warning system. Putting aside the lack of evidence on whether the pool area had such a system, the record does not raise a fact issue that A.R. or other individuals with disabilities were deprived of the benefits of such a system because of their disabilities. A.R.'s own inability to give or hear a warning is not at issue; she was the subject of the emergency, not one giving an alarm or responding to it.

The plaintiffs allege that the pool was made unsafe — and that A.R. was denied the benefit of safe swimming — because A.R.'s hearing-impaired peers who saw her fall into the pool could not alert adults quickly enough. The plaintiffs allege that this is intentional discrimination based on A.R.'s disability. The argument appears to be that when the school allowed A.R. to swim, it put her safety into the hands of those around her — primarily other hearing-impaired children — and then failed to provide an accessible means for those children to notify adults of an urgent need for help.

In the complaint, the plaintiffs complained of the lack of "an emergency button to sound an alarm or one to set off bright and flashing lights." (Docket Entry No. 28-2, ¶ 12). In their responses to HISD's first set of interrogatories, the plaintiffs identified a failure to "assure that the swimming pool had an emergency notification system in place to assure that persons with such a disability

_____

part of the response brief. Instead, it is addressed in the section on HISD's failure to implement the IEP.

19

could communicate with others in a manner commensurate with their disability and in a timely

manner, so as to address an emergent situation." (Docket Entry No. 98, Ex. 12, at 4). In their

response to the motion for summary judgment, the plaintiffs state that "there is no evidence provided

in any of the documents provided by the school . . . that a student who was hearing impaired, and

in an emergent situation, could access emergency care, like a button that could be easily pushed and

would emit a piercing sound or button that could easily be pushed that activate[d] flashing lights,

both letting staff know that an emergency was occurring." (Docket Entry No. 107, at 23–24). The

plaintiffs continue:

> [A] review of all of the summary judgment evidence produced by the
> Defendant or even by A.R., or otherwise available through public
> access means, regarding pool safety for the deaf and hearing impaired
> population show[s] that the swimming pool at the T.H. Rogers
> School did not have a emergency notification system, and certainly
> not a visual alarm system, as required by the ADA, the implementing
> rules and guidelines developed by the United States Access Board as
> well [as] Texas law noted at the Tex. Human Res. Code 121.003; the
> Houston Municipal Code, and numerous Houston ISD Board
> policies.

(Docket Entry No. 107, at 50–51 (emphasis omitted) (citations omitted)). The plaintiffs contend that

"[f]or all construction started after the ADA was promulgated, including swimming pools, a visual

alarm system is required by the ADA and the [ADA Accessibility Guidelines]" and that "[f]or all

pre-ADA construction, a reasonable safety plan that accommodates the needs of the deaf community

is required. A review of the summary judgment evidence provided by the school denotes that the

T.H. Rogers pool had neither." (*Id.* at 51 (citation omitted)).

The problem with this argument is that it is not supported by the summary-judgment

evidence. There is competent evidence that the school had a "visual alarm system" of the type the

plaintiffs describe, with flashing lights. "In June of 2008, there was a fire alarm system in the pool area which people could activate. The fire alarm devices emitted a very loud sound and contained a very bright light like a strobe light that flashed when the alarm was activated." (Docket Entry No. 112, Ex. B, Muzyka Aff., ¶ 2). As HISD argues, there is no competent summary-judgment evidence that the school's pool area lacked such an alarm system.

There is no evidence that A.R. was denied the benefit of safe swimming because HISD denied her peers access to a visual alert system. *See, e.g.*, *Wells v. Thaler*, 460 F. App'x 303, 312–13 (5th Cir. 2012) (rejecting a claim that the plaintiff "was denied the benefits of [a] law library *because* he was not provided the accommodation he ultimately requested;" "[a]lthough the law library did not provide [the plaintiff] his requested accommodations, the [defendants] demonstrate that the existing accommodations were more than sufficient to give [the plaintiff] effective and meaningful access to the law library" (emphasis added)); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) (explaining that liability under the ADA arises when a benefit is denied because of the failure to provide a reasonable accommodation); *see also Burns-Vidlak ex rel. Burns v. Chandler*, 165 F.3d 1257, 1259 (9th Cir. 1999) ("The [district] court further held, and Hawaii conceded, that monetary damages are available to compensate injuries *caused by* Hawaii's violation of Title II and Section 504." (emphasis added) (citing *Burns-Vidak ex rel. Burns v. Chandler*, 939 F. Supp. 765, 770, 773 (D. Haw. 1996))). Visual alarms are designed to inform a hearing-impaired individual that an emergency exists. The issue in this case, however, is whether hearing-impaired children were prevented from alerting hearing adults. There is ample and uncontroverted summary-judgment evidence that a number of people with no hearing impairment were in the pool area when A.R. fell in the pool. The statements by children in the area indicate that

some promptly tried to alert the responsible adults who were poolside.  There is no evidence that even if the alarms were auditory-only, a hearing-impaired child had less access to trip the alarm than a hearing child.  Even if HISD failed to provide a visual warning alarm system, there is no evidence that A.R. was denied the benefit of safe swimming because other hearing-impaired children were unable to set off strobe lights.

Even assuming that the pool area lacked emergency-alert devices specifically modified to have lights as well as sound alarms, the evidence does not create a factual dispute material to determining whether HISD denied A.R. access to safe swimming or failed to make accommodations based on her hearing disability.  "[P]rogram accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held."  *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291–92 (5th Cir. 2012); *see also Wells*, 460 F. App'x at 312–13.  The plaintiffs' argument that HISD failed to provide handicapped-accessible warning devices is premised on the idea that HISD relied on A.R.'s peers to make the pool safe for swimming.  The record does not support this.  The record does not show that HISD relied solely on other children with hearing disabilities to make the pool safe for swimming.  Adult swimming coaches Evans and Waters, who could hear, were assigned to the pool for safety purposes.  Evans described her job as follows: "I watch over the pool.  I make sure the kids are being safe and watching the kids in the pool." (Docket Entry No. 107, Ex. G, at 74).  There is undisputed evidence that Evans and Waters were in the pool area.  (*Id.* at 97).  There is also other undisputed testimony that a total of at least three teachers and three teacher's assistants were in the pool area.  (*Id.* at 125).  Evans also offered undisputed testimony that a teaching assistant for a different group of students was already in the pool when

A.R. fell in and helped Evans pull A.R. from the water. (*Id.* at 119–20). Many of the adults around the pool had cell phones; there was a telephone mounted to the wall near the pool; and Waters had a walkie-talkie he could use for prompt communications with the school nurse, the front office, and other staff.

The plaintiffs argue that "neither a telephone nor walkie-talkie is of much help to a deaf child or a deaf–hearing impaired teacher, parent or coach who might have used the pool for a public purpose." (Docket Entry No. 107, at 20 n.13). The communication devices in place — a telephone and a walkie-talkie — were not meant for use by other hearing-impaired children or other hearing-impaired adults in order to accommodate the needs for safe swimming for children with multiple disabilities and hearing impairment. HISD placed these communication devices in the hands of the adult supervisors and there is no suggestion that any were hearing impaired.

There is also undisputed evidence that the hearing-impaired children in the summer program at T.H. Rogers could effectively communicate in an emergency. According to Evans, "[t]hey will make a noise. They will yell out. They will come touch you. They will sign." (Docket Entry No. 107, Ex. G, at 145).

There are allegations and (disputed) evidence in the record that, taken in the light most favorable to the plaintiffs, shows that the adults' attention was diverted from the pool, or that the adults were not close enough to the pool when A.R. fell in, so that Evans did not immediately grasp why some of the children were trying to get her attention. There is (disputed) evidence that could suggest that the students did get the adults' attention, but the adults ignored them for what turned out to be a short but critical time. But the allegations and evidence show no more than a negligent failure to be sufficiently attentive, sufficiently close to the pool, or sufficiently responsive. There

is no evidence or argument that the adults who were teaching or providing support services to this summer-enrichment program for disabled children were inattentive or too far away from the pool because they were intentionally discriminating against children with disabilities.  No party argues that the adults were deliberately indifferent to the children's disabilities or to the need to accommodate reasonably those disabilities.  Nor was it gross misjudgment for HISD to provide safety and communication devices that were usable to the persons it made responsible for safety, even if those persons were tragically negligent in carrying out their responsibilities.

The only "misjudgment" applicable is the misjudgment that the hearing pool staff would adequately supervise A.R.  HISD put the telephone and walkie-talkie in the pool area for use by the supervising adults.  The plaintiffs' argument is that the children who saw A.R. fall in had difficulty in getting the attention of the adults because their attention was *negligently* diverted from A.R.  It is tragic that the safety measures HISD put in place failed to prevent the drowning.  But it is not evidence of intentional discrimination that HISD's safety measures were negligently carried out. "While the facts alleged in the complaint are disturbing, and likely point to negligence on the part of those responsible for [A.R.] on the day in question . . . . '[a]cts of negligence do not come within the ambit of the ADA.'"  *J.D.*, 2011 WL 2971284, at *7 (quoting *Norman v. DCJ–ID*, 2007 WL 3037129, at *5 (E.D. Tex. Oct. 18, 2007)).

HISD is entitled to summary judgment on the plaintiffs' ADA and § 504 claims.

### B.     The Failure to Implement A.R.'s IEP

The plaintiffs allege that A.R. was denied the reasonable public education as provided in her IEP because of various accommodations for pool safety HISD failed to make.  The plaintiffs allege that A.R. was denied the benefit of public education because her disabilities — a seizure disorder

and deafness — were not accommodated during the summer-enrichment program.  The issue is whether the record gives rise to a triable issue of bad faith or gross misjudgment on the part of HISD's educators and staff.  *See D.A.*, 629 F.3d at 454–55.

"It is not entirely clear within the Fifth Circuit when an educator's actions will constitute bad faith or gross misjudgment."  *I.A.*, 2012 WL 3028350, at *8.  But the precise standard need not be resolved here.  The plaintiffs' claim necessarily fails because A.R.'s IEP says nothing about any disability other than deafness, and says nothing about swimming.[11]  The only modifications listed are for audio amplification and for preferential seating.  In Section D of the IEP, "Opportunities to participate in non-academic and extra curricular activities are available to all children receiving special education services," there is a list of boxes to check for activities "[t]he child may be excluded from."  The "athletics" box is not checked, nor is the "other" box; only "transportation" is checked.  Below, in the explanation section, the IEP states that "[A.R] is not participating in a regular transportation due to safety and communication needs."  (Docket Entry No. 107, Ex. A, at HISDAR0060).  Assuming that the IEP applied to the summer-enrichment program, the plaintiffs have not shown that there was anything about seizures or swimming in the IEP for HISD employees to accommodate.  Any failure to accommodate seizures or modify swimming conditions could not have been a gross misjudgment of how to implement A.R.'s IEP.  HISD is entitled to summary judgment on this claim.

---

[11]  The parties also dispute whether A.R.'s IEP would have been in effect for a summer-enrichment program, but that dispute is not material to the outcome.  Either way, there is nothing in the IEP that HISD could be said to have failed to implement in the course of the swimming program.

25

**IV.     Conclusion**

HISD's motion for summary judgment is granted.  HISD's motion to strike the plaintiffs'

expert-witness list is denied as moot.  Final judgment is entered by separate order.

SIGNED on January 30, 2013, at Houston, Texas.

_____
                     Lee H. Rosenthal
              United States District Judge